GEORGE W. SMITH v. WILLIAM HARBERT'S ADMINISTRATOR.

The 1st section of the act of 20th March, 1848, prescribing the mode of establishing the liabilities of drawers, indorsers, &c., reads as follows: "The holder of any bill of exchange or promissory note, assignable or negotiable by law, may secure and fix the liabilities of any drawer or indorser of such bill of exchange, and every indorser of such promissory note, without protest or notice, by instituting suit against the acceptor of such bill of exchange, or against the maker of such promissory note, before the first term of the district court to which suit can be brought, after the right of action shall accrue, or by instituting suit before the second term of said court, after the right of action shall accrue, and showing good cause why suit was not instituted before the first term next after the right of action accrued." (Paschal's Dig., Art. 229, Note 290.)

And the 4th section of said act reads as follows: " The holder of any such bill of exchange or promissory note may also secure and fix the liability of any drawer or indorser of such bill of exchange or promissory note, for the payment thereof, without suit against the acceptor, drawer, or maker, by procuring such bill or note to be regularly protested by some notary public of any county, for non-acceptance or non-payment, and giving notice of such protest to such drawer or indorser, according to the usage and custom of merchants." (Paschal's Dig., Art. 232, Note 293.)

The 6th section of said act, which was repealed on the 11th of January, 1862, reads: "Three days of grace shall be allowed on all bills of exchange and promissory notes assignable and negotiable by law: *Provided,* That the 4th, 5th, and 6th sections of this act shall extend only to contracts between

merchant and merchant, their factors and agents." (Paschal's Dig., Note 295.)

And by the act of 11th January, 1862, this last section is made to read as follows: "Three days of grace shall be allowed on all bills of exchange and promissory notes assignable and negotiable by law." (Paschal's Dig., Art. 234, Note 295.)

By the 5th section of the act of 7th December, 1861, which was re-enacted 2d of December, 1863, known as the stay law, it is declared that, during the existence of the war, "it shall not be necessary for the holder of any bill of exchange or promissory note to bring suit against the acceptor of such bill of exchange, or against the maker of such promissory note, in order to secure and fix the liability of any drawer or indorser of such a bill of exchange or any indorser of such promissory note." (Paschal's Dig., Arts. 5130, 5144.)

It will thus be seen that, from the 7th of December, 1861, to the 11th of January, 1862, a little more than one month, there was no way of fixing the liability of an indorser of a promissory note provided by law, unless the note or bill was between merchant and merchant.

The legislature required all parties holding notes or bills indorsed to have the same protested from and after the 11th of January, 1862.

The 5th section of the act of 1861, which dispensed with the necessity of requiring suit to be brought against the maker, in order to hold the indorser of a note liable during the war, ceased to be of any validity from and after the time that the act requiring and permitting protests of all notes indiscriminately took effect. (Paschal's Dig., Art. 5130.)

A note which matured on 16th November, 1861, should have been protested, or at least have been sued, at the fall term of the provisional court of 1865, in order to hold an indorser liable.

In answer to the *ab initio* argument, that the courts established by Provisional Governor Hamilton were unconstitutional and void, the court reviewed Leitsensdorfer v. Webb, 20 How., 176, in regard to the provisional government established by General Kearney for New Mexico, and held that the case of Texas was similar; and that after the overthrow of the state governments in 1865, when all civil officers ceased to execute their functions, Governor Hamilton had the right to establish provisional courts, in which suits might have been brought.

ERROR from Colorado. The case was tried before Hon. BENJAMIN SHROPSHIRE, one of the district judges.

All the facts necessary are set forth in the opinion.

*Robert L. Foard,* for plaintiff in error.—I. The endorsement being in blank, the presumption is that it was made at

the date of the note. (2 Tex., 447; 9 Tex., 619; 14 Tex., 354; 18 Maine, 393; 19 Maine, 232; 8 Wend., 600; 6 Md., 319.) The maker of the note, Rhodes, was not sued at the first or second term of the court after the maturity of the note, which is generally necessary to fix the liability of the indorser; that is, to make it a complete and unconditional obligation on his part. (O. & W. Dig., Art. 94.) This is the general rule, and forms a part of the endorser's contract. (2 Pars. on Bills and Notes, 23; 8 Metc., 97; Story on Bills, §§ 176, 157, 112; 11 Tex., 58; 24 Tex., 312; 17 Tex., 103.)

There are exceptions to this general rule: 1st, when the maker may reside beyond the limits of the state, (O. & W., Art. 91;) 2d, if the maker be dead; (14 Tex., 672; 2 Tex., 153;) he being considered beyond the jurisdiction of the court; 3d, when the maker of the note is notoriously insolvent.

II. The plaintiff attempts to excuse the want of suit against Rhodes at the proper time on these grounds: That this suit was instituted at the first term of the court, when there was no legal disability for the institution of the suit; that the opening of the courts in part by the provisional governor at the last fall term, 1865, was without the authority of law, until validated by the late constitutional convention, and that it was owing to its doubtful legality that suit was not commenced at the fall term of said court, 1865.

III. It may be contended that Smith's liability as indorser was extended beyond the first or second term of the district court after the maturity and indorsement of the note, to wit, the fall term, 1862, and spring term, 1863, by the stay law of December 7, 1861. (Acts 9th Leg., 5; Paschal's Dig., Arts. 5125, 5130.)

Waiving for the present the question of the constitutionality of this law, if it be admitted that it retroacts upon and affects this note and indorsement thereon, we hold, by

the terms of it, Smith was released from his indorsement by failure to sue at the fall term, 1865. The stay law (§ 5) undertook to dispense with suit against the maker of a promissory note until January, 1864, "or until otherwise provided by law." This act was extended by one taking effect on January 1, 1864, until twelve months after a treaty of peace between the confederate government and the United States, "or until otherwise provided by law." (Acts 11th Leg., 5; Paschal's Dig., Arts. 5140, 5144.)

IV. When the holder of the note could have sued the maker, from that moment, Smith, as indorser, could hold him to the condition of suing at the first or second term, with cause shown for not suing at the first term; and we hold that the proclamation of Governor Hamilton, of August, 1865, opening the courts, operated as a repeal of the stay laws, if they were not unconstitutional and void, and was, within the very terms of the stay law, a mode "otherwise provided by law" for suing on this note. And suit not having been instituted at the first term, (fall, 1865,) nor any good reason shown for the delay, Smith was released from his indorsement for that reason. The proclamation of Governor Hamilton cannot now be questioned. He had authority from the United States Government to organize a state government, and did so, at least *de facto*, in August and September, 1865, (Paschal's Dig., pp. 929, 930; 20 How., 176, as to powers of provisional governor,) and the convention ratified his acts in opening the courts, (Paschal's Dig., p. 950;) and we contend that if the stay law be constitutional and legally retroactive on this contract, still that Smith is released from his endorsement by reason of the failure to sue at fall term, 1865. This court will, *ex officio*, take notice of the term at which suit is brought, and whether to the first term at which suit could have been brought. (2 Tex., 473, 16 Tex., 696; 2 Tex., 475.)

V. But we believe the stay law to be unconstitutional and void, because it impaired the contract in the total and com-

plete suspension of all remedy, and leaving none active and subsistent.     (12 Wheat., 370; 9 Pet., 329; 8 Wheat., 175.; 2 How., 608; 2 Casey, 287; Hemp., 313; 15 How., 315; 1 Blackf., 443; 3 How., 716; 24 How., 464.) Some remedy must be left. (Austin v. White, Dallam, 434; 7 Tex., 288; 4 Tex., 473.)

*John T. Harcourt*, for defendant in error.—I. The statute prescribes the mode of establishing the liability of an indorser. (Paschal's Dig., Art. 229.)

"This act was intended to substitute a statutory diligence in the place of the diligence required by the law merchant." (Sydnor v. Gascoigne, 11 Tex., 456; Cartwright v. Roff, 1 Tex., 78; Hutchins v. Flintge & Ralsten, 2 Tex., 473.)

Whatever will excuse the plaintiff from averring demand and notice, will excuse him from the use of the diligence prescribed by the statute. (Durrum v. Hendrick, 4 Tex., 495; Frosh v. Holmes, 8 Tex., 29.)

"Want of presentment at maturity is excused by any inevitable or unavoidable accident, not attributable to the fault of the holder; for this would bring it within the rule which excuses a demand whenever it is morally or physically impossible." (Schofield v. Bayard, 3 Wend., 488; 1 Pars. on Notes and Bills, 460.)

Among the circumstances recognized by Mr. Justice Story as constituting an excuse are the following:

"The presence of political circumstances amounting to a virtual interruption and obstruction of the ordinary negotiations of trade.

"Public and positive interdictions and prohibitions of the state, which obstruct or suspend commerce and intercourse." (Story on Prom. Notes, 257, 263.)

It is believed that we may safely rely upon these causes to excuse the want of due presentment in the present case.

II. The existence of the war and the political disturb-

xxx—43

ances of the country effected a "virtual interruption and obstruction of the ordinary negotiations of trade."

III. Again, the legislation of the state constituted a positive prohibition against the institution of a suit on the note of H. D. Rhodes, and relieved the plaintiff from the necessity of instituting suit. By the stay law, approved 7th December, 1861, all laws for the collection of debts on promissory notes were suspended until otherwise provided by law. The 5th section of that act declares, "that it shall not be necessary, during the time named in this act, for the holder of any bill of exchange or promissory note to bring suit against the acceptor of such bill of exchange or against the maker of such promissory note, in order to secure and fix the liability of any drawer or indorser of such promissory note.". (Acts 9th Leg., Paschal's Dig., Art. 5125.)

By the act of 13th January, 1862, the statutes of limitation were suspended so far as they refer to debts and claims due on bills, bonds, and promissory notes. (Paschal's Dig., Art. 4630.)

By the act of 26th February, 1863, all statutes of limitation on all civil rights of action of every kind, whether real or personal, were suspended until one year after the close of the war. (Paschal's Dig., Art. 4631.)

IV. It is contended by the opposing counsel that the proclamation of Governor Hamilton, of August, 1865, opening the courts, operated as a repeal of the stay laws, and was a mode "otherwise provided by law" for suing on this note.

We most respectfully submit that the court will not yield its judicial sanction to a doctrine fraught with so much danger to the best interests of our people. It involves the question that is so agitating the public mind, as to the extent of our subjugation, and the power of the Government to exercise the power of conquest and occupancy over the seceded States as conquered provinces.

The authority relied upon by the plaintiff in error, in support of this position, is the decision of the Supreme Court of the United States in the case of Leitensdorfer *et al.* v. Webb.   (20 How., 176.).

We contend that Governor Hamilton was invested with no legislative power, and could not annul or repeal the stay law.

The American theory of government is, that there shall be three separate and distinct departments: executive, legislative, and judicial; and that no one exercising the power of one of those departments shall exercise any power properly attached to either of the others.

"The powers of government in this country are distributed in departments, and each department is confined within its constitutional limits."   (Jackson v. Phelps, 3 Caines, 69; Ogden v. Blackledge, 2 Cranch, 272; Jones v. Wooten, 1 Harrington, Del., 77; Field v. The People, 2 Scammon, Ill., 79.)

The one-man power, such as was exercised by Governor Hamilton, was repugnant to article IV, section 4, of the Constitution of the United States.

We contend therefore that the stay law was not annulled by the act of the provisional governor, and it remained in full force until his acts were validated by the late convention.

This suit was instituted at the first term after that was done.

V. The plaintiff in error contends that the stay law was unconstitutional, because it impaired the contract in the total and complete suspension of all remedy, leaving none active and subsisting.

A law may be constitutional in part and unconstitutional as to other parts, and the courts will sustain so much as is constitutional.   (Titus v. Latimer, 5 Tex., 433; O'Brien v. Dunn, 5 Tex., 570; David Thomas v. The State, 9 Tex.,

324; Ferris v. The B. B., B. & C. R. R., at the Galveston term, 1863.) [26 Tex., 588.]

We contend that that portion of the act (the 5th section) which affected the indorser related merely to the remedy of the holder of the promissory note, and did not injuriously affect any right of the maker or indorser of the note in question.

"No law which mitigates or molifies the severity of another law in favor of the citizen can be denominated that character of retroactive law which is prohibited by the Constitution. (9 Bac. Abr., 221, note; Story on Const., 199, sec. 1345.)

"A state may regulate at pleasure the modes of procedure in its courts in relation to past contracts as well as future." (Smith's Com. on the Const., secs. 254, 265; Call v. Haggar, 8 Mass., 430; Watson v. Mercer, 8 Pet., 88.)

"A state law which makes valid a void contract does not impair the obligation of a contract within the meaning of the Constitution of the United States." (Satterlee v. Mathewson, 2 Pet., 380; Paschal v. Perez, 7 Tex., 348.)

VI. It is further contended by the plaintiff in error that the act of 29th March, 1848, was in force at the time of his indorsement, and that his liability was conditioned according to the terms of that act, which entered into and constituted a part of the contract. This doctrine, as applicable to the facts of this case, has been forcibly repudiated by our court in the case of Gautier v. Franklin, 1 Tex., 736.

In delivering the opinion of the court, Chief Justice Hemphill says: "If statutes of limitation could in any just sense be regarded as forming a part of the contract, their operation should be admitted wherever the contract is litigated. But they are not so considered.

"In making contracts, the future time (if any) which is

in the contemplation of the parties is the day of the maturity of the contract, and not that on which, by lapse of time, exemption may be claimed from its performance. A contrary doctrine would impute to the obligee a contemplated evasion of his obligation from the inception of his agreement, and would, in the language of Lord Brougham, turn a protection against laches into a premium for evasiveness." (Story's Confl. of Laws., 482.)

It cannot be seriously questioned that the 1st section of the act of 29th March, 1848, was a law of limitation, in "prescribing the time within which the right of action must be exercised" to fix the liability of the indorser.

If any part of the existing laws regulating the liability of indorsers entered into and became a part of the contract, we have a right to insist that all the laws relating to that subject were also incorporated as part of the contract. Then it was a part of the contract that the act of 29th March, 1848, was a substitute for the demand and notice required by the law merchant. That whatever would excuse the plaintiff from averring demand and notice, would excuse him from the use of the diligence required by the statute. That all the causes which we have enumerated would, if they should occur, present a good excuse for the want of demand and notice or the statutory diligence, and that the legislature might change the remedy of the holder of the note.

VII. We deny the construction contended for as to the effect of the act of 11th January, 1862, repealing the 1st section of the act of 28th March, 1848. All the acts relating to the mode of securing the liability of the indorser must be taken and construed together. It was not made imperative upon the holder of any such paper to have the note protested.

But, independent of all the questions we have discussed, it is respectfully insisted that this case is relieved of all embarrassment by the 5th section of an ordinance of the

late convention, which reads as follows: "In all civil actions the time between the 2d day of March, 1861, and the 2d day of September, 1866, shall not be computed in the application of any statute of limitation."

MORRILL, C. J.—On the 1st March, 1866, Harbert instituted suit against Smith, based upon a note made by H. D. Rhode, payable to the order of Smith, calling for $1,697 16, six months after the date of 16th November, 1861.

It is alleged in the petition that Smith, for value received, indorsed the note in blank to plaintiff; that the maker of the note has departed this life; that there is no administrator on his estate, which is insolvent; and that this is the first term of the district court, when there was no legal disability, for the institution of the suit. That the opening of the courts, in part, by the provisional governor, at the last fall term, was without the authority of law, until validated by the late constitutional convention, and it was owing to its doubtful legality that suit was not commenced on said note at the fall term of said court.

The defendant, Smith, admits the execution and indorsement of the note, and pleads, also, that at the fall term, 1865, the district court was legally held in the county of Fayette, where the maker of the note resided; and because the plaintiff neglected to institute suit against the maker at the first term of the court in which suit could be brought after the maturity of the note, that defendant is not liable.

The plaintiff excepted to the answer of defendant, because it was legally insufficient.

The cause was submitted to the judge on the pleadings, and judgment given for the plaintiff on the note.

It has been brought to this court, and the errors assigned relate to the sufficiency of the answer.

The note, being dated 16th November, 1861, and due at six months, matured on the 16th May, 1862.

By the act of 20th March, 1848, (Paschal's Dig., Art.

229,) it was provided, that "the holder of any bill of exchange or promissory note, assignable or negotiable by law, may secure and fix the liabilities of any drawer or indorser of such bill of exchange, and every indorser of such promissory note, without protest or notice, by instituting suit against the acceptor of such bill of exchange or against the maker of such promissory note before the first term of the district court to which suit can be brought after the right of action shall accrue, or by instituting suit before the second term of said court after the right of action shall accrue, and showing good cause why suit was not instituted before the first term next after the right of action accrued."

The 4th section of said act (Paschal's Dig., Art. 232) provided, "that the holder of any such bill of exchange or promissory note may also secure and fix the liability of any drawer and indorser of such bill of exchange or promissory note, for the payment thereof, without suit against the acceptor, drawer, or maker, by procuring such bill or note to be regularly protested, by some notary public of any county, for non-acceptance or non-payment, and giving notice of such protest to such drawer or indorser, according to the usage and custom of merchants."

The 6th section of the same act provided, "that three days of grace shall be allowed on all bills of exchange and promissory notes, assignable and negotiable by law; provided, that the 4th, 5th, and 6th sections of this act shall extend only to contracts between merchant and merchant, their factors and agents."

On the 7 December, 1861, the legislature passed an act, the 5th section of which provides: "During the time named in this act, (until the 1st January, 1864, or six months after the close of the war,) or until otherwise provided by law, * * * it shall not be necessary for the holder of any bill of exchange or promissory note to bring suit against the acceptor of such bill of exchange, or against

the maker of such promissory note, in order to secure and fix the liability of any drawer or indorser of such bill of exchange or any indorser of such promissory note."

On the 11 January, 1862, the legislature further provided, (Paschal's Dig., Art. 234,) "that the 6th section of an act prescribing the mode of establishing the liabilities of drawers and indorsers of bills of exchange and promissory notes, approved 20 March, 1848, be so amended as to read as follows: SEC. 6. Three days of grace shall be allowed on all bills of exchange and promissory notes assignable and negotiable by law.".

Thus we perceive that from the 20 March, 1848, until the 7 December, 1861, the only method of fixing the liability of an indorser of a promissory note, except in those cases wherein the contract was between merchant and merchant, was by instituting suit against the maker of such promissory note, before the first term of the district court to which suit could be brought, or before the second term, and showing good cause why suit was not instituted before the first term. And we also see, that from and after the 11 January, 1862, by the repeal of the 6th section, in part, that the indorser of a promissory note could be fixed in his liability to pay the same by a protest, as provided in Paschal's Digest, article 232, above quoted. And we also can see, that from the 7 December, 1861, to the 11 January, 1862, (a little more than one month,) there was no way or method of fixing the liability of an indorser of a promissory note provided by law, unless the note or bill was between merchant and merchant.

The cause of the repeal of the 6th section of the act of 1848, and thereby declaring no distinction between mercantile and other notes, was evidently brought about from the fact that there was the same necessity that there should be a way provided by which indorsers should be apprized as to their liabilities to pay the note in one case as in the other; and we therefore consider that the legislature re-

quired all parties and persons holding notes or bills thus indorsed to have the same protested from and after 11th January, 1862.   That the 5th section of the act of 1861, (Paschal's Dig., Art. 5130,) which dispensed with the necessity of requiring suit to be brought against the maker, in order to hold the indorser of a note liable, during the war, ceased to be of any validity from and after the time that the act, requiring and permitting protests of all notes indiscriminately, took effect.

The note in the case under consideration matured on the 16th May, 1862, and the liability of the indorser could have been fixed, and should have been fixed, if the indorser intended to hold him liable, by having the note protested.

This view of the case renders it unnecessary to discuss the point raised by the pleadings, as to whether the courts that were in existence after the surrender of the confederate armies, and previous to the election of the judges by virtue of the constitution of 1866, were legal or otherwise. But lest it may be supposed that we have any doubt on this point, or that it may be thought that we consider the district judge did not err on the pleadings as presented, we will make a short statement of our views relative thereto.

In the case of Leitensdorfer v. Webb, 20 Howard, 176, the Supreme Court of the United States said: "Upon the acquisition, in the year 1846, by the arms of the United States, of the territory of New Mexico, the civil government of this country having been overthrown, the officer, General Kearney, holding possession for the United States in virtue of the power of conquest and occupancy, and in obedience to maintaining the security of the inhabitants in their persons and property, and under the sanction and authority of the United States, instituted a provisional or temporary government for the acquired country.

"By this substitution of a new supremacy, although the former political relations of the inhabitants were dissolved,

their private relations, their rights vested under the government of their former allegiance, or those arising from contract or usage, remained in full force and unchanged, except so far as they were in their nature and character found to be in conflict with the constitution and laws of the United States, or with any regulations which the conquering and occupying authority should ordain. Amongst the consequences which would be necessarily incident to the change of sovereignty would be the appointment or control of the agents by whom, and the modes in which, the government of the occupant should be administered; this result being indispensable in order to secure those objects for which such a government is usually established.

"This is the principle of the law of nations as expounded by the highest authorities.

"Accordingly, we find that there was ordained by the provisional government a judicial system, which created a superior or appellate court and circuit courts, in which the laws were to be administered.

"Of the validity of these ordinances of the provisional government there is made no question with respect to the period during which the territory was held by the United States."

From the 14 February, 1845, to the 2 March, 1861, Texas was one of the United States, *de facto* and *de jure;* but from the last-named period till the 26 day of May, 1865, it was in reality in open war with the United States, and all of its officers swore allegiance to some other supposed government in open warfare to the United States. When the army of the United States conquered the armies of this supposed government, of which Texas formed a part, there was not within the length and breadth of the state a civil or military officer whose oath of office required his allegiance to the United States. And so conscious were these officers of this fact, that they did not even pretend to exercise the functions of office, from the governor to

constable, and from a supreme judge to a justice of the peace.   In a word, the relative position of New Mexico in 1846, and of Texas in 1865, to the United States was similar, saving that the hostile feeling of the latter was more intense to the United States.   What General Kearney did in Santa Fé, as hereinbefore stated, Governor Hamilton, for the same reasons, did in Texas.   Each had the same authority, emanating from the same source, the commander-in-chief of the army and navy of the United States. And if from this fact the validity of the acts of General Kearney "'are to be beyond question," as is stated by the Supreme Court in the opinion from which we have so largely quoted, with what propriety can the acts of Governor Hamilton be questioned, when, in addition thereto, his acts were ratified by the convention as well as the people of Texas?   We have made an unnecessary digression. The parties in the  district court seem to have acted as if they were not aware of the existence of the statute which authorized the protest of the note.

But as the defendant pleaded that he was not liable, because he was not sued till 1866, when there was a court in which suit could have been brought in 1865, and no good cause was shown why he was not sued in 1865, we conceive that the judge erred in not sustaining this defense; and we also consider that as the note was not protested, agreeably to the requirements of the statutes, at the time it was due and payable, the plaintiff had no cause of action against defendant at the institution of the suit.

JUDGMENT REVERSED AND CAUSE DISMISSED..